## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

James V. Lacy, in his capacity as
President of United States Justice Foundation and
Policy Issues Institute
30011 Ivy Glenn Drive, Suite 223
Laguna Niguel, California 92677

                                                Civil Action Case No.

United States Justice Foundation
30011 Ivy Glenn Drive, Suite 223
Laguna Niguel, California 92677

Policy Issues Institute
30011 Ivy Glenn Drive, Suite 223
Laguna Niguel, California 92677

and

Alexander Tomescu
30011 Ivy Glenn Drive, Suite 223
Laguna Niguel, California 92677

                                   Plaintiffs,

                 v.

Federal Election Commission
1050 First Street, NE
Washington, D.C. 20463,

                                   Defendant.

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This is an action brought under 52 U.S.C. § 30109(a)(8)(A) of the Federal

Election Campaign Act of 1971, as amended ("FECA" or the "Act"), challenging the

Federal Election Commission's dismissal of an administrative complaint filed by United

States Justice Foundation and Policy Issues Institute (whose President is James V. Lacy)

and Alexander Tomescu (collectively, "Plaintiffs") against National Public Radio ("NPR").

Plaintiffs allege that NPR violated FECA by making prohibited in-kind corporate

contributions to 2024 Presidential candidates Joseph R. Biden and Kamala Harris and failing to report independent expenditures advocating for Biden and Harris.  This action does **not** seek to defund NPR but instead simply seeks to have it regulated by the Federal Election Commission ("FEC" or the "Commission"), like any other Federal political action committee whose content amounts to express advocacy expenditures made in coordination with candidates.

2.    Plaintiffs filed their administrative complaint with the FEC on October 10, 2024, and the complaint was designated as Matter Under Review ("MUR") 8328.  On April 21, 2025, the FEC notified counsel for Plaintiffs that, after considering the circumstances of the matter and information provided in response to the administrative complaint, the Commission had voted to dismiss the matter and close the file.

3.    Under 52 U.S.C. § 30109(a)(8), if the FEC dismisses an administrative complaint, the complainant may file an action in this Court within sixty (60) days of the dismissal, seeking judicial review of the FEC's action and a declaration that the FEC's dismissal was contrary to law.

4.    This action is timely brought pursuant to 52 U.S.C. § 30109(a)(8). Plaintiffs seek judicial review of the FEC's action dismissing MUR 8328 and a declaration that the dismissal of MUR 8328 was arbitrary, capricious, and contrary to law under 52 U.S.C. § 30109(a)(8)(C). Plaintiffs further seek an order from this Court requiring the FEC to conform with such declaration within 30 days. *Id.*

## JURISDICTION & VENUE

5.      This Court has both subject matter and personal jurisdiction over this action under 52 U.S.C. § 30109(a)(8)(A). This Court also has jurisdiction over this matter under 28 U.S.C. § 1331.

6.       Venue lies in this district under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C. § 1391(e).

## PARTIES

7.      Plaintiff James V. Lacy ("Lacy") is an individual who brings this action in his capacity as the Founder and President of Plaintiff United States Justice Foundation and the President of Plaintiff Policy Issues Institute.  Lacy received his undergraduate degree at the University of Southern California and his Juris Doctorate from Pepperdine University School of Law, where he has served as a member of the Board of Visitors.  Lacy is admitted to practice law in California and the District of Columbia and served as a California delegate to two Republican National Conventions, an aide to Howard Jarvis—the author of California's Proposition 13—and as National Chairman of Young Americans for Freedom.  Lacy worked in the Reagan Administration in Washington, D.C. for all eight years, including as a senior executive at the Commerce Department and as General Counsel to the U.S. Consumer Product Safety Commission.  Lacy resides in the City of Dana Point, in Orange County, California, where he has served as a member of the City Council and Chairman of the Planning Commission and is the publisher of the California Political Review, www.capoliticalreview.com.

3

8.      Plaintiff United States Justice Foundation ("USJF") was founded in 1979 as a nonprofit public interest, legal action organization dedicated to instructing, informing, and educating the public on, and litigating on, significant issues confronting America.  The attorneys who founded USJF sought to advance the original understanding of constitutional jurisprudence in the judicial arena.  USJF continues to be involved in public interest litigation, for example, as a successful plaintiff seeking government records under the Freedom of Information Act in *Lacy v. U.S. Dep't of State*, No. SA CV 22-1065-DOC, 2023 WL 4317659 (C.D. Cal. May 3, 2023).

9.      Plaintiff Policy Issues Institute ("PII") has worked over the last two decades to educate and inform the public regarding public policy issues that impact the constitutional order upon which our country was founded.  PII is primarily focused on promoting robust First Amendment protections for citizens and exposing government overreach that contravenes fundamental American principles such as free speech, freedom of the press, and other natural rights enumerated in the Constitution.

10.      Plaintiff Alexander Tomescu ("Tomescu") is an individual and an employee of Plaintiff USJF, who joined Wewer & Lacy, LLP in 2012 after earning his Juris Doctor degree from Chapman University School of Law in Orange, California.  At Chapman Law, Tomescu served as the Director of Operations for the school's branch of the Federalist Society and received a CALI Award for obtaining the highest class grade in Campaign and Election Law. Prior to that, Alexander received a Bachelor's degree in Political Science, with a minor in Science & Technology, at the University of California, San Diego, achieving Provost Honors and spending a semester in Washington, D.C. working as an intern for Congressman Christopher Cox.

11.     Defendant FEC is an independent federal agency charged with the administration and civil enforcement of FECA.  52 U.S.C. § 30106.

## STATUTORY AND REGULATORY FRAMEWORK

12.     FECA was enacted to "to limit the actuality and appearance of corruption resulting from large individual financial contributions." *Buckley v. Valeo*, 424 U.S. 1, 26 (1976) (per curiam).  FECA limits the dollar amounts and permissible sources of contributions to candidates and requires public disclosure  of funds spent or received to influence federal elections.  This disclosure "provides the electorate with information . . . in order to aid the voters in evaluating those who seek federal office," helps "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity," and is "an essential means of gathering the data necessary to detect violations of the contribution limitations." *Id*. at 67–68.

13.     Under FECA, a "contribution" is defined as "money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). "Anything of value" includes "all in-kind contributions." 11 C.F.R. § 100.52(d)(1). The Act imposes aggregate limits on contributions to candidates and their authorized committees per election. 52 U.S.C. § 30116(a).

14.     Corporations are prohibited from making any contributions to federal candidates, and federal candidates are prohibited from accepting corporate contributions. 52 U.S.C. § 30118(a).

15.     Unlike contributions to candidates, expenditures that "expressly advocate" for or against the election of a federal candidate are generally not subject to dollar limits under FECA. *See* 11. C.F.R. § 100.22 (defining "expressly advocating").

16.     However, any expenditure by a person other than a candidate or candidate's authorized committee that is "coordinated" with a candidate is an in-kind contribution to the candidate and must be reported as a contribution to, and expenditure by, that candidate's authorized committee. 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. § 109.21(b)(1). "Coordinated" means "made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate [or] a candidate's authorized committee," including an agent thereof. 11 C.F.R. § 109.20(a).

17.     The definition of "expenditure" under FECA excludes the costs of "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate." 52 U.S.C. 30101(9)(B)(i); *see also* 11 C.F.R. §§ 100.132. The Commission's regulations also exempt "[a]ny cost incurred in covering or carrying a news story, commentary, or editorial" from the definition of "contribution." 11 C.F.R. § 100.73. These exemptions are known as FECA's "press exemption."

18.     The FEC has developed a two-part test to determine whether the press exemption applies to specific activity. First, the Commission asks whether the organization engaging in the activty is a "press entity," *i.e.*, "whether the entity in question is in the business of producing, on a regular basis, a program that diessminates news stories, commentary, and/ or editorials." FEC Advisory Op. 2019-05 at 4. For the second part of the press exemption framework, the FEC considers whether: (i) the entity is owned or controlled by a political party, political committee, or candidate; and (ii) the activity in question is a "legitimate press function." *See* FEC Advisory Op. 2011-11 at 6-7. To decide

6

whether activity qualifies as a "legitimate press function," the Commission assesses whether the entity's materials are available to the general public and are comparable in form to other materials that it ordinarily publishes. *See* FEC Advisory Op. 2010-08 at 6; FEC Advisory Op. 2008-14 at 5.

19.     Candidate committees must report all contributions (including the value of in-kind contributions and coordinated expenditures) exceeding $200. 52 U.S.C. § 30104(b)(3)(A); 11 C.F.R. §§ 104.3, 104.8. Similarly, candidate committees must report expenditures (including coordinated expenditures) exceeding $200. 52 U.S.C. § 30104(b)(5)(A); 11 C.F.R. §§ 104.3, 104.9.

20.     Any person who believes there has been a violation of FECA may file a sworn administrative complaint with the FEC. 52 U.S.C. § 30109(a)(1). Based on the complaint, the response from the person or entity alleged to have violated FECA, and facts and recommendations developed by the Office of General Counsel, the FEC then decides whether there is "reason to believe" that a violation of FECA has occurred. 52 U.S.C. § 30109(a)(2). A "reason to believe" finding exists where an administrative complaint "credibly alleges" that a violation of FECA "may have occurred." FEC, Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process, 72 Fed. Reg. 12,545 (Mar. 16, 2007). If at least four commissioners vote to find there is "reason to believe" a violation of the FECA has occurred, the FEC must notify the respondents of that finding and "shall make an investigation of such alleged violation." 52 U.S.C. § 30109(a)(2).

21.     If the FEC instead dismisses an administrative complaint, an action may be filed in this Court to reverse such dismissal by seeking a judicial declaration that the

dismissal was contrary to law.  52 U.S.C. § 30109(a)(8)(A). A court may find that the FEC's dismissal of an administrative complaint was contrary to law "if the Commission relied on 'an impermissible interpretation of the Act,' or the dismissal was otherwise 'arbitrary or capricious, or an abuse of discretion.'" *End Citizens United PAC v. FEC*, 69 F.4th 916, 918 (D.C. Cir. 2023) (quoting *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986)). Specifically, courts review dismissal of an administrative complaint "by considering the rationale offered by the Commissioners who voted against enforcement." *Campaign Legal Ctr. v. 45 Committee, Inc.*, 118 F.4th 378, 391 (D.C. Cir. 2024).

## **FACTS**

22.    On October 10, 2024, Plaintiffs filed an administrative complaint with the FEC against NPR, which attached the USJF report entitled "*NPR Exposed: Why NPR Fails FEC Press Exemption*."  A true and correct copy of the administrative complaint and the USJF report are attached hereto as **Exhibit 1** and incorporated herein by this reference.

23.    The administrative complaint alleged that NPR violated 11 C.F.R. § 100.73 and other parts of the Act, and requested that the FEC: (1) investigate these allegations; (2) find reason to believe  that NPR violated FECA; (3) conduct an investigation to determine the extent of the violations; and (4) take appropriate enforcement action to protect the public interest and the integrity of the electoral and campaign finance system.

24.    Among the claims made in the administrative complaint were:

a.    Throughout the 2024 general election cycle, and since at least the 2020 election cycle, NPR and its employees and agents clearly and unmistakably engaged in express advocacy in support of the Democratic nominee for the President of the United States (initially, President Joe Biden, and later Vice

President Kamala Harris) and in opposition to the Republican nominee, then-former President Donald J. Trump. In doing so, NPR failed to meet the FEC's standard of a "bona fide news organization."

b.      Pursuant to 11 C.F.R. § 100.73 and the FEC's press exemption, a bona fide news organization is exempt from federal campaign contribution restrictions with respect to its costs in "covering or carrying a news story, commentary, or editorial." NPR, however, advocates for Democratic Presidential nominees and against the Republican Presidential nominees in a manner that transgresses the press exemption and instead meets the "express advocacy" standard set forth in 52 U.S.C. § 30101(17) and 11 C.F.R. § 100.22(b).

c.      NPR is not a bona fide news organization in that its coverage of the 2024 presidential election failed to meet the FEC's press exemption due to its express advocacy in support of the Democratic nominee and its open hostility to then-former President Trump. Accordingly, commentary, analysis, and editorializing by NPR's employees and agents should not be subject to FECA's press exemption. Instead, NPR's coverage of the Presidential race violated FECA, because NPR's "journalism" amounted to an illegal, undisclosed corporate contribution, initially to the Biden campaign and then to the Harris campaign.

d.      NPR engages in "express advocacy" that is ultimately invaluable to the Democratic Party. Under 11. C.F.R. § 100.22(b)(1-2), express advocacy occurs in connection with communications which, "when taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election

or defeat of one or more clearly identified candidate(s) because – 1) The electoral portion of the communication is unmistakable, unambiguous and suggestive of only one meaning; and 2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action." It was apparent, both before and after former Vice President Harris became the Democratic Presidential nominee, that NPR, and several of its employees and agents, were expressly advocating for the election and policies of the Democratic Party's nominee and against those of the Republican nominee. Indeed, it is abundantly clear that NPR, through its editorial decisions and the presentation of the news by its employees and agents, was unabashedly engaging in express advocacy in favor of Biden, and then Harris. In doing so, NPR demonstrated its failure to meet FECA's free press exemption for campaign expenditure restrictions through its express advocacy against then-former President Trump. As described below, NPR either refused to cover certain stories that were truthful but unflattering to the Democratic candidate or provided *excess* coverage of stories that were not truthful but nonetheless harmful to the Republican candidate.

e.      The Democratic Party also exercises control over NPR. The Democratic Party, through its donors, volunteers, and agents, constitutes and exercises control over, a majority of NPR's Board of Directors, including, but not limited to, NPR President and CEO Katherine Maher and NPR Foundation Board Chair John McGinn.

f.      Indeed, much of NPR's Board of Directors are frequent—and

exclusive—donors to the Democratic Party, totaling hundreds of thousands of dollars. For instance, since 2018, NPR Board Member Matthew Barzun has donated nearly $350,000 to Democratic candidates, including $20,000 just two weeks after his appointment to the Board. NPR Board Member and Foundation Board Chair McGinn donated close to $6,000 to the 2020 Biden Campaign during his tenure.

g.    Importantly, the press exemption does not apply to media corporations that are "owned or controlled by any political party committee, political committee, or candidate."  52 U.S.C. § 30101(9)(B)(i); (*see also* FEC Advisory Opinion 2005-07.  "Corporate contribution prohibitions would apply with equal force to all media corporations unless their activities fall within the specific exemption for any news story, commentary, or editorial." (USJF Report, at 3 & 9-33.)

h.    NPR fails to operate like a typical news organization.  NPR's activity surrounding its treatment of then-former President Trump constitutes "express advocacy" and reportable campaign activity and, as such, requires proper campaign finance disclosure.  In April 2024, then-NPR employee Uri Berliner, a Peabody Award-winning journalist who worked at NPR for 25 years, disclosed facts evidencing extreme political bias at NPR, a failure to abide by journalistic ethical standards, and a political operation to stop Donald Trump's 2024 presidential campaign.  NPR's actions constitute reportable campaign activities as they are not typical journalistic activities, nor are they a "legitimate press function."  (USJF Report, at 3 & 37-38.)

Among the observations Berliner made about NPR's bias are:

11

1) NPR, which purports to consider all things and once had an open-minded spirit, has lost America's trust and lost its way by telling listeners how to think.

2) The rise of NPR's advocacy took off with Donald Trump, whose election in 2016 was greeted with a mixture of disbelief, anger, and despair. What began as tough, straightforward coverage veered toward efforts to damage or topple Trump's presidency. Persistent rumors that the Trump campaign colluded with Russia over the election became the catnip that drove reporting. NPR hitched its wagon to Trump's most visible antagonist, Representative Adam Schiff (D-Calif.), who, as the top Democrat on the House Intelligence Committee, became NPR's guiding hand, its ever-present muse. NPR interviewed Schiff approximately twenty-five times about Trump and Russia, and during many of those conversations, Schiff alluded to purported evidence of collusion. The Schiff talking points became the drumbeat of NPR news reports. But when the Mueller report found no credible evidence of collusion, NPR's coverage was notably sparse and "Russiagate" quietly faded from its programming.

3) In October 2020, the New York Post published an explosive report about the laptop Hunter Biden abandoned at a Delaware computer shop containing emails about his sordid business dealings. With the election only weeks away, NPR turned a blind eye, with its managing editor for news explaining: "We don't want to waste our time on stories that are not really stories, and we don't want to waste the listeners' and readers' time on stories

that are just pure distractions." But it wasn't a pure distraction, or a product of Russian disinformation. The laptop did belong to Hunter Biden and its contents revealed his connection to the corrupt world of multimillion-dollar influence peddling and its possible implications for his father, Joe Biden. One of NPR's more talented journalists said that it was good that NPR wasn't following the laptop story because it could help Trump.

4) Having deemed the "lab leak" theory of COVID's origins to be "racist" or a "right-wing conspiracy theory," NPR reported that the theory of COVID escaping from a lab had been debunked by scientists when it had not. NPR refused to change course, even after the U.S. Department of Energy announced that a lab leak was the most likely explanation for the emergence of the virus. It can be surmised that labeling the more dominant theory amongst Republicans as "racist" and rejecting its plausibility outright, despite evidence to the contrary, was designed to demonize Republicans writ large.

5) In Washington, D.C., where NPR is headquartered and many of its reporters and staff live, Berliner noted that 87 registered Democrats and no Republicans were working in editorial positions.

i.    NPR fails to meet the standard for a press exemption insofar as it did not operate like a typical, bona fide news organization in its coverage of the 2024 presidential election. NPR hired President and CEO Katherine Maher – a former Biden for President campaign volunteer who has made numerous federal campaign contributions to Democrat campaigns or political action committees and has been a vocal Trump opponent – even though she had never worked in

journalism. In 2024, Berliner criticized the hiring of Maher as moving NPR in the wrong direction away from ethical journalism. (USJF Report, at 3 & 34-36.) Notably, on March 26, 2025, Maher testified under oath before Congress and admitted that NPR's leadership acknowledges it made mistakes in its coverage of the Hunter Biden laptop story. Maher also said that she regretted her 2020 tweets in which she described President Trump as a "racist" and "sociopath."

      j.     NPR fails to meet the press exemption framework. In considering the scope of the press exemption, the FEC has relied on a two-part framework presented in *Reader's Digest Association v. FEC*, 509 F. Supp. 1210, 1215 (S.D.N.Y 1981): (1) Whether the press entity is owned or controlled by a political party, political committee, or candidate; and (2) Whether the activity at issue is a "legitimate press function." NPR has failed both parts of this framework, because it is controlled by Democratic Party operatives and it did not act as a press entity in its biased and one-sided coverage of the candidates for President in the 2024 election cycle.

## ADMINISTRATIVE PROCEEDINGS

25.    On October 11, 2024, Plaintiffs filed their administrative complaint and the USJF Report with the FEC.

26.    On October 17, 2024, the FEC sent Plaintiffs' counsel a letter acknowledging receipt of the administrative complaint and USJF Report and designating the matter as Matter Under Review ("MUR") 8328. The FEC also provided Plaintiffs' counsel with a document entitled "Description of Preliminary Procedures for Processing Complaints Filed with the Federal Election Commission."

27.     Also on October 17, 2025, the FEC notified NPR of the administrative complaint and requested a response.

28.     On November 15, 2024, NPR's counsel responded to the administrative complaint.

29.     On January 31, 2025, the FEC Office of General Counsel issued a four-page Enforcement Priority System Dismissal Report (the "EPS Dismissal Report").  In the EPS Dismissal Report, the Office of General Counsel recommended that the Commission dismiss the administrative complaint "consistent with the [FEC's] prosecutorial discretion to determine the proper ordering of its priorities and use of agency resources." Additionally, the Office of General Counsel rated the matter "low priority for [FEC] action" and noted, in passing, that the press exemption was apparently applicable.  The EPS Dismissal Report referred to the FEC's previous findings, in MUR 7230 from 2017, which pertained to the 2016 Presidential election, that NPR "is not owned or operated by a political party, political committee, or candidate . . . ."  In a rush to dismiss the Plaintiffs' administrative complaint, the FEC relied on its eight-year-old findings relative to a separate matter, MUR 7230, instead of focusing on and credibly assessing the specific facts and allegations raised in MUR 8328.  After all, what NPR was doing in 2016 is certainly different from what NPR was doing in 2024 – so much so that Uri Berliner felt the need to point it out, at the risk of losing his job.

30.     On February 24, 2025, the FEC decided, on a 4-0 vote, to dismiss the administrative complaint and to close the FEC's file 30 days after the certification of the FEC's vote to dismiss the matter.

31.     On March 20, 2025, the FEC's Deputy Secretary certified the February 24,

2025 decision.

32.     On April 21, 2025, the FEC closed its file and sent Plaintiffs' counsel a letter informing them of this decision.  Accompanying the April 21, 2025 letter was a copy of the January 31, 2025 EPS Dismissal Report.

33.     On May 8, 2025, the FEC General Counsel's office sent Plaintiffs' counsel a copy of an April 28, 2025 "Statement of Reasons of Vice Chairman James E. "Trey" Trainor, III and Commissioner Allen J. Dickerson," providing their views regarding the administrative complaint. This brief Statement of Reasons, like the Office of General Counsel's EPS Dismissal Report, did not adequately address the particular facts and allegations of MUR 8328; instead, it expounded on these Commissioners' opinions about the First Amendment's broad applicability to press activity.

34.     Plaintiffs have been aggrieved by the FEC's dismissal of the administrative complaint.

## CAUSE OF ACTION

## FECA— Dismissal of Administrative Complaint Contrary to Law 52 U.S.C. § 30109(a)(8)(A)

35.     Plaintiffs reallege and incorporate by this reference all preceding paragraphs as if fully set forth herein.

36.     In response to the administrative complaint, the FEC, on April 21, 2025, notified Plaintiffs of the decision to dismiss the matter, thus triggering the sixty (60) day time period in which to file this action.

37.     As the foregoing paragraphs have made clear, there was "reason to believe" that NPR violated FECA and FEC regulations by making and failing to report

16

excessive and prohibited in-kind corporate contributions to the 2024 Democratic Presidential nominee, through its biased and one-sided coverage of the 2024 Presidential candidates, which amounted to express advocacy to support the election of Joe Biden and then Kamala Harris.

38.    The FEC's decision to dismiss the administrative complaint was arbitrary, capricious, and contrary to law. Neither the FEC's EPS Dismissal Report nor the FEC Commissioners' Statement of Reasons indicate that the FEC even considered the USJF report (Exhibit 1) or Uri Berliner's evidence regarding NPR's political bias. At the very least, FEC staff should have considered the USJF report and Berliner's evidence – and interviewed Berliner. Plaintiffs' administrative complaint credibly alleged that NPR made and failed to report excessive and prohibited in-kind corporate contributions to the Biden/ Harris campaign, in violation of FECA and the Commission's regulations; and that, throughout the 2024 election cycle, NPR was controlled by Democratic Party operatives who, in close cooperation and consultation with the Biden/ Harris campaign, consistently published biased media content that amounted to express advocacy for the Democratic presidential candidates—and therefore NPR's activities were not entitled to protection under FECA's press exemption.

39.    Despite the credible allegations in Plaintiffs' administrative complaint that NPR had violated the Act, the FEC's Office of General Counsel recommended, and four Commissioners voted to approve, dismissal of the complaint, by relying primarily on a prior enforcement matter from eight years ago and without properly considering the particular facts and allegations made in MUR 8328.

40.    The Statement of Reasons later issued by Commissioners Dickerson and

Trainor, likewise, offered little reasoning to support the FEC's vote to dismiss the credible and detailed allegations set forth in Plaintiffs' administrative complaint aside from emphasizing more generally that press outlets are protected by the First Amendment.

41.     While Plaintiffs do not dispute this assertion, the Statement of Reasons issued by Commissioners Dickerson and Trainor offers a position contrary to law, insofar as it reveals that effectively no amount of bias or entanglement with a political party could cause a media organization to lose its press exemption

42.     The Commission's cursory treatment and dismissal of Plaintiffs' administrative complaint, both in the EPS Dismissal Report and in the two Commissioners' Statement of Reasons, provides little specific support for the FEC's decision not to investigate NPR's alleged FECA violations, in contravention of the agency's clear duty to enforce the Act under 52 U.S.C. § 30109. *See Campaign Legal Ctr. v. 45 Committee, Inc.*, 118 F.4th 378, 391 (D.C. Cir. 2024). Dismissal of Plaintiffs' administrative complaint was therefore arbitrary, capricious, and contrary to law.

43.     The FEC's dismissal of the administrative complaint has caused Plaintiffs and the public at large to be aggrieved by denying them critical information about the electoral process, including a full accounting of the sources of contributions and expenditures made to influence federal elections.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiffs, by their undersigned counsel, respectfully request that the Court grant the following relief:

a)     declare that the FEC's dismissal of the administrative complaint was

arbitrary, capricious, and contrary to law under 52 U.S.C. § 30109(a)(8)(A);

b)      order the FEC to conform with such declaration within 30 days, pursuant

to 52 U.S.C. § 30109(a)(8)(C);

c)      award Plaintiffs costs and attorneys' fees incurred in this action; and

grant such other and further relief as this Court deems just and proper

Dated June 9, 2025

Respectfully submitted,

*/s/ Erielle Davidson*
Erielle Davidson (DCB# 90002903)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, N.W., Suite 643
Washington, DC 20037
(202) 737-8808
*edavidson@holtzmanvogel.com*


Bradley W. Hertz
LAW OFFICES OF BRADLEY W. HERTZ
22815 Ventura Blvd, #405
Los Angeles, CA 91364
(818) 593-2949
*brad@bradleyhertzlaw.com*


*Attorneys for Plaintiffs*